# STATE OF VERMONT

# ENVIRONMENTAL COURT

Appeals of First Student, Inc.    }
}
}  Docket Nos. 138-8-01Vtec
}  and 211-12-01 Vtec
}
}

## Decision and Order

Appellant First Student, Inc. appealed in Docket No. 138-8-01Vtec from a July 31, 2001 decision of the Zoning Board of Adjustment (ZBA) of the Town of Woodstock, denying an amendment to Appellant's conditional use approval to allow parking of 21 school buses on site year-round. In Docket No. 211-12-01 Vtec Appellant appealed from an October 31, 2001 decision of the ZBA, denying an amendment to Appellant's conditional use approval to allow parking of 21 school buses on site during the day and 17 overnight, year round.

Appellant is represented by Marvin Wolf, Esq.; the Town of Woodstock is represented by Todd C. Steadman, Esq. This matter was assigned to another judge for a time and was returned to Judge Wright as of April 2002. Interested person Shirley Wagner withdrew her appearance from these appeals as she had moved from the vicinity of Appellant's property. The parties had briefed motions for summary judgment, but later agreed to the amendment of the Statement of Questions, requesting the Court to disregard the pending motions and agreeing to dismiss all issues in both appeals other than the following:

Under state and local statutes and regulations, as well as applicable case law, may First Student, Inc. place either 17 or 21 buses on site during the school year.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took two site visits alone, by agreement of the parties, one during the summer and one after the beginning of the school year. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellant's predecessor, the Bruce Transportation Group, obtained conditional use approval in Appeal of Wagner, Docket No. 10-1-97 Vtec (formerly Docket No. E97-010) (March 27, 1998 and May 20, 1999), to demolish an existing residential garage on the property and in its place to build a 40' x 50' garage, 25½ ' high, for school bus maintenance on its site. At the time of that application, Appellant's predecessor held an existing conditional use approval for the use of the existing house on the site as an office for its school bus business, and for the outdoor parking of eight school buses.

In connection with the conditional use approval application to build the maintenance garage, the applicant applied for and the Court granted the application to park up to 10 school buses on the property in the school year and to park up to 21 school buses on the property in the summer months. Most of these buses remain parked basically in storage on the site for the whole summer. All the parking or storage of buses on site, other than the buses located within the maintenance garage, was required to be located in a designated screened parking area. One specific condition of the approval required the maintenance and replacement of the trees planted for screening of the parking area. Another specific condition of the approval restricted the approval to the parking and maintenance of school buses. While it included both scheduled and emergency maintenance, it did not authorize the property to be used as a terminal for daily school bus traffic, nor for drivers to come onto the site in their buses to pick up paychecks or for other office-related functions. Evidence was presented in that proceeding that most of the buses would be those used in the local school systems, and that routine overnight parking of the buses would occur at the high school. Appellant' s predecessor also obtained an Act 250 permit (Land Use Permit #3W0058-1) for this project, also allowing parking or storage of up to 10 school buses in the school year and up to 21 school buses in the summer.

In the applications now before the Court, Appellant has applied for an amendment to its conditional use approval, allowing it to park 21 (or 17) buses on the site year-round. Appellant' s manager testified that it would have 13 or 14 buses on the site an most normal days, but is seeking the additional numbers to have some flexibility in its operations.

Appellant' s property is a three-acre parcel located in the Commercial/Light Industrial zoning district. It is located at an elevation lower than that of U.S. Route 4, and has a driveway with access onto U.S. Route 4. Route 4 is the main east-west route in this vicinity for all vehicles, including heavy trucks, and carries approximately 7100 vehicles per day, of which approximately 6½ % to 7% are heavy trucks (a higher percentage than the 2% normally found on roads of this size and type). It carries 850 vehicles in the peak hour at this location.

The office and maintenance garage, and a parking area for ten passenger vehicles, are located near Route 4 at the foot of the driveway. The area designated for parking of the school buses is located southwesterly on the property from the garage and passenger vehicle parking area. It is required to be screened by planted evergreen trees and existing deciduous vegetation under the 1998 permit conditions. That area is sufficiently dry to accommodate 21 buses stored there for long-term parking over the summer school vacation. However, parts of it are wet or impassable in the winter and spring months, during which time parking occurs on parts of the property not approved for such parking, regardless of the number of buses. In addition, some of the trees required for screening may not have survived and may have not been replaced as required in the conditions. Evidence was also presented that more than the allowed ten buses have been located on the site at times since the 1998 permit litigation. However, the Town has not filed an enforcement case and the Court will not address these asserted or admitted violations in considering whether the proposed amendment should be approved.

From the office at the project site, Appellant manages the office work, scheduling and dispatching[1], and maintenance of 66 school buses (and approximately five smaller vans) for 26 school districts. Four employees work at the site: the manager, a dispatcher, and two

maintenance technicians. An average of two, but as many as three or four buses may be on site for scheduled maintenance on any given day, plus one or two buses a week undergoing some sort of breakdown maintenance. As of the trial date, an additional six buses were dispatched from the site, that is, the drivers would come to the site in the early morning, leave their cars, take the six buses out on their routes, return about 8:00 a.m, and leave the site with their cars, repeating the sequence in the mid-afternoon. Depending on the weather conditions, at least these six vehicles are left idling for a period sufficient to warm up and be operated, even if Appellant's written idling policy is adhered to. This idling produces exhaust fumes that rise up and are perceived by people passing by on the street directly across Route 4, running parallel to and at an elevation above Route 4. The site is also used for the temporary parking of school buses as they wait for students during arts events which occur approximately nine times during the school year. Appellant also operates its school buses out of the school day or school year on a charter basis, and transports students to athletic and arts events beyond the normal school day operation.

The location and design of the driveway access onto Route 4 provides an adequate sight distance to the west for a school bus driver who is approaching the site from the east, to see whether the eastbound lane is clear, before turning across that lane to enter the site. However, because of the curve in the road approaching the site from the east, the sight distance is more limited for a vehicle approaching the site from the east to see a stopped school bus waiting to turn left into the site. The required stopping sight distance (the distance required for the traveling vehicle to perceive the stopped school bus, put on the brakes, and come to a stop) is 400 to 475 feet. A 570-foot distance is available at that location, which should be adequate if the westbound drivers are not exceeding the posted 50 mile per hour speed limit, are not affected by glare from the setting sun, are not driving heavily laden tractor-trailer trucks, and if the distance is not reduced by more than three 40-foot school buses stacked up waiting to turn left, or the equivalent length of vehicles waiting behind such buses.

On the other hand, because of the curve in the road approaching the site from the east, the corner sight distance is insufficient for a stopped school bus waiting to turn left out of the site onto Route 4 to see a vehicle coming around that curve and to pull out and accelerate to an adequate speed in front of the traveling vehicle. This sight distance must be calculated for a vehicle such as a school bus or unit-body medium truck, which has a slower ability to accelerate than does a passenger vehicle, both because of the engine characteristics of school buses and because the bus must travel uphill on the driveway to reach Route 4. The recommended sight distance for such a vehicle is 642 feet, while only 559 feet is available. The corner sight distance of 559 feet is adequate for a passenger vehicle such as the drivers' or the employees' vehicles, for which the recommended corner sight distance is 550 feet.

Both the left turn maneuver into the westbound lane of Route 4 from the site, and the ability of a westbound vehicle coming around the curve toward the site to perceive a stopped school bus waiting to turn left, are made more difficult in the afternoon by glare[2] from the setting sun, which is in the westbound drivers' eyes as they come around the curve.

Under the present restrictions, only one school bus makes the left turn from the project site onto Route 4 in the morning peak hour; the other five turn right. Under the proposal, as many as seven school buses would make the left turn from the project site in the morning and again in the

afternoon, merging into or cutting across the lanes occupied by the hundreds of vehicles passing by on Route 4 in the morning and afternoon peak hours. While the volume of all the vehicles coming onto and leaving the property will not appreciably affect the volume of traffic already on Route 4, the particular geometry of and turning maneuvers of that traffic will adversely affect the safety of the traffic on Route 4, as well as the safety of Appellant's vehicles and drivers.

One way of dealing with slow-moving traffic entering a roadway is to provide a so-called acceleration lane, providing room for the slow-moving traffic to come up to at least 70% of the speed of the traveling traffic. Such a lane is impractical at this location, for several reasons. The school bus traffic needing to use the acceleration lane first would have to travel across the eastbound lane to reach the acceleration lane. If the acceleration lane were installed as a center lane, it would be confusing to westbound traffic coming around the curve on Route 4, as normally a lane for slower traffic is on the right and a second lane in the center is customarily used as a passing lane. The available space for such a lane in this location is insufficient to function as a passing lane. If the acceleration lane were installed as the right-hand one of the two westbound lanes, a school bus attempting to use the acceleration lane would have to travel across the westbound lane of traffic to reach the acceleration lane which, given the 40-foot length of the slow-moving school bus, would conflict with the westbound traffic in any event.

Moreover, the geometry of the access is such that a school bus turning right onto Route 4 from the access driveway extends into the oncoming westbound lane for a short time before straightening out into the eastbound lane.

Based on the evidence, the use of the access of this site onto Route 4 will adversely affect the safety of the traffic on Route 4 and that of the school buses themselves, for the numbers of trips that would be generated by the coming and going of up to 21 school buses as much as twice a day, plus an equal number of trips by the drivers and on-site employees in their own vehicles.

We note in connection with this conclusion that the original approval of this site for 10 school buses on site during the school year in connection with the approval of the maintenance garage did not constitute an approval of the use of the site as a school bus depot or terminal. Neither Appellant nor its predecessor has obtained approval of this site for the routine parking of school buses overnight, or temporary parking during special events, where the drivers arrive in the morning in their own vehicles, drive out with the school bus, return with the bus, and leave in their own vehicles, because such a proposal represents a significant increase in trips on and off the site, regardless of the number of buses entitled to be parked or stored on the site at any given time.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant's proposals to amend its conditional use approval to allow the parking of 17 or 21 school buses on the property year-round is DENIED.

Done at Barre, Vermont, this 6th day of January, 2003.

_____
Merideth Wright
Environmental Judge

**Footnotes**

[1]  "Dispatching" is done from the office in the sense of deciding which buses with which drivers go to what locations on what schedules, but only six of them actually leave from the site on a daily basis.

[2]  This is a different 'glare' consideration than that considered by the planning commission in the site plan approval, which had to do with glare produced by lights or reflections originating on the site itself.